UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF MICHIGAN

---

WENDY PRIEST,

    Plaintiff,

v.

FEINBERG SCHOOL OF MEDICINE, NORTHWESTERN UNIVERSITY, and DR. GUIDO MARRA

    Defendant.

Case No. _____

HON.

---

BRIAN A. MOLDE (P63790)
VEN R. JOHNSON (P39219)
JOHNSON LAW, PLC
Attorneys for Plaintiff
99 Monroe Avenue, N.W., Suite 975
Grand Rapids, MI  49503
616-235-9400/Fax: 616-235-9444
bmolde@venjohnsonlaw.com

---

## PLAINTIFF'S COMPLAINT

Plaintiff, Wendy Priest, by her counsel, Johnson Law, PLC, and for her Complaint against the Defendant, states as follows:

## NATURE OF ACTION AND JURISDICTION

1. This is an action alleging medical malpractice by the named defendants and to recover damages for the plaintiff, Wendy Priest.

1

2. This Court has subject matter jurisdiction over this claim based on the diversity of the parties and pursuant to 28 USC § 1332.

3. Venue is proper in this Court pursuant to 28 USC § 1391(b)(2).

## THE PARTIES

4. Wendy Priest is a 67-year-old woman who resides in Portage, Michigan.

5. Dr. Guido Marra is an orthopedic surgeon who lives and practices in Chicago, Illinois.

6. The Feinberg School of Medicine is part of Northwestern University, both of which are located in Illinois.

7. The amount in controversy in this matter exceeds the jurisdictional requirement of $75,000.00, exclusive of interest and costs and without considering counterclaims.

## FACTUAL BACKGROUND OF PLAINTIFF'S CLAIMS

8. Wendy first presented to Dr. Guido Marra at Northwestern University's Feinberg School of Medicine in August 2014 for examination of her right shoulder, which had been painful for her.

9. Wendy had been referred to Dr. Marra for his expertise in performing orthopedic surgeries, and she was interested in his opinion regarding whether her complaints could be solved by his treatment.

10. On August 28, 2014, Dr. Marra saw Wendy at his offices. He told her that after reviewing MRI and EMG studies, she had appropriate muscle and nerve structure and that he wanted to perform a third surgery on her shoulder to reattach her ligaments in her shoulder and avoid a total shoulder replacement surgery.

11. Wendy agreed to the proposed surgery and it was scheduled and performed on December 16, 2014, at Northwestern University Hospitals in Chicago, Illinois.

12. Wendy had post-operative visits with Dr. Marra on January 2, 2015 and February 3, 2015.

13. At the February 2015 appointment with Dr. Marra, he prescribed physical therapy for her in an attempt to regain some of the function of her right arm and hand that she had before the surgery had been performed. That physical therapy began in Kalamazoo in February 2015.

14. On February 26, 2015, Wendy's physical therapist, Scott Miller, working in Kalamazoo, spoke with Amy, Dr. Marra's physician assistant, to discuss with her the fact that he was uncomfortable performing any therapy on Wendy given the state that her shoulder was in.

15. Scott Miller sent photographs to Dr. Marra's office on that date to document the deformity and asked for a referral for X-ray of the shoulder.

16. Dr. Marra's physician assistant, Amy, told Wendy that it was unlikely that her shoulder was dislocated and that she would not order the X-rays.

17. Wendy waited three weeks more to see Dr. Marra in his office.

18. The next follow-up appointment in Chicago was March 17, 2015. Dr. Marra spent five minutes with Wendy, looked at the state of her shoulder, ordered another MRI, and left the exam room.

19. On March 26, 2015, Wendy Priests' MRI was scheduled to take place at Borgess Hospital in Kalamazoo.

20. She presented herself to the radiology department, but during the X-ray procedure which preceded the MRI, the technologist stopped the procedure because, as he told Wendy, "there is no joint to inject dye into".

21. In fact, her humerus was hanging below the normal joint, and she had suffered a Sachs-Hills deformity due to the humerus bone being so far out of its normal position.

22. The technologist at Borgess contacted Dr. Marra's office from Kalamazoo, and Wendy was told to go to the emergency department.

23. While in the emergency department in Kalamazoo, numerous attempts were made to contact Dr. Marra's office at Northwestern; no response ever came.

24. Wendy was not seen by an orthopedic surgeon in the emergency department, she was told that no surgeon was willing to treat her due to the fact that she was under the care of a different surgeon (Dr. Marra).

25. Eventually, the emergency department discharged with pain medication for her after more than eight hours of waiting for a response from Dr. Marra.

26. Over the next two weeks, from her home in Michigan, Wendy made several attempts to get Dr. Marra's office or Dr. Marra himself to see her and treat her for her chronically dislocated and painful joint.

27. Multiple emails were sent to his office asking for assistance and treatment, but no appointment with Dr. Marra was scheduled and she was told he was on vacation.

28. Finally, she was offered an appointment with Dr. Marra's partner, Dr. Saltzman, on April 21.

29. By this time, almost two months had passed between the physical therapists' recognition of a dislocation and the visit with Dr. Saltzman.

30. More than four months had passed since the surgery done by Dr. Marra.

31. Dr. Saltzman saw Wendy's shoulder and immediately refused to perform surgery on her.

32. Dr. Saltzman told her that he thought the procedure would be a reverse shoulder replacement and that he was not willing to attempt a repair to her shoulder given how it appeared to him.

33. Wendy saw Dr. Marra a final time approximately one week after Dr. Saltzman refused to operate on her, but he again did nothing further for her.

34. Frustrated with the actions of Dr. Marra and his office, Wendy Priest scheduled an appointment with Dr. James Carpenter at the University of Michigan.

35. He saw Wendy on May 6, 2015, and scheduled her for surgery on May 8, 2015.

36. After surgery, Dr. Carpenter explained to Wendy and her daughters that the surgery was complicated due to the fact that the shoulder had been dislocated for so long that the muscles and ligaments did not want to rebound to their normal positions.

37. He explained that the nerves in the shoulder had also been stretched, and damaged, by the length of time that they were displaced.

38. As a result of the negligence by Dr. Marra, Northwestern University, the Feinberg School of Medicine, and Dr. Marra's staff, Wendy's arm and hand have been permanently damaged.

39. She has essentially no function in her right arm, and extremely limited use of her hand and fingers.

40. Her life has been permanently altered and her quality of life greatly diminished.

41. At all times relevant to this lawsuit, defendant Marra was the actual, implied, ostensible, or express agent of the defendant Feinberg School of Medicine and pursuant to the doctrines of *respondeat superior* and/or vicarious liability, defendant Feinberg School of Medicine is therefore liable for any and all negligent acts and omissions as well as all of

the consequent injuries and damages that were proximately caused by the defendants' negligence.

42. At all times relevant to this lawsuit, defendant Marra was the actual, implied, ostensible, or express agent of the defendant Northwestern University and pursuant to the doctrines of *respondeat superior* and/or vicarious liability, defendant Northwestern University is therefore liable for any and all negligent acts and omissions as well as all of the consequent injuries and damages that were proximately caused by the defendants' negligence

## COUNT 1: MEDICAL MALPRACTICE

43. Pursuant to the applicable standard of practice, Dr. Marra owed a duty to Wendy Priest to do at least the following:

    a. Perform and appreciate a thorough and pertinent physical examination;

    b. Be available or have a designated provider available for postoperative care and instruction;

    c. Timely discover the dislocation before permanent damage to surrounding structures results and perform appropriate procedures, including but not limited to further surgeries to repair the dislocation or causes of the dislocation;

    d. Perform appropriate emergency surgery to repair the injury and damage to the shoulder joint, including the dislocation, upon discovery of the injury and damage;

    e. Properly refer to and request consultations by specialists and consultants to provide appropriate medical care in the event that you are not able to do so;

    f. Any and all other breaches of the standard of care either described in this Notice or found to have been violated during the course of discovery and investigation.

44. In Contrast to the duty owed to Wendy Priest to comply with the applicable standard of practice, defendant Dr. Marra was negligent and professionally negligent in the ways set forth above and as detailed in the attached Affidavit of Merit and failed to comply with the standard of practice in his care and treatment for Wendy Priest.

45. As a direct and proximate result of the breaches of the standards of care set forth above, Wendy Priest lost the use of her right hand and arm.

46. More specifically, because Dr. Marra, his employers, principals, and employees and agents failed to properly provide care and treatment for Wendy Priest, her arm was left in a compromised and dangerous condition.

47. Once the dislocation was discovered, Dr. Marra failed to promptly act to treat her condition.

48. All of these acts of negligence caused her to suffer muscle and nerve injuries which are now permanent and have dramatically lowered her quality of life and impacted her ability to use her right hand and arm.

49. Accordingly, and due to the negligence of the defendants as outlined above, plaintiff Wendy Priest claims all damages that are fair and just under the circumstances, both economic and non-economic, and which are allowed by law.

Wherefore, plaintiff demands judgment in her favor and against the defendants, jointly and severally, in an amount that is fair and reasonable under the circumstances, together with costs, interest, and attorney fees as permitted and which will clearly exceed the jurisdictional limits of this Court.

Dated: August 25, 2017

Respectfully submitted,

JOHNSON LAW, PLC

By: _____
VEN R. JOHNSON (P39219)
BRIAN A. MOLDE (P63790)
Attorneys for Plaintiff
99 Monroe Avenue, N.W., Suite 975
Grand Rapids, MI 49503
(616) 235-9400

## DEMAND FOR JURY TRIAL

NOW COMES Plaintiff, WENDY PRIEST, by and through her attorneys, JOHNSON LAW, PLC, hereby demand a trial by jury pursuant to Federal Rule of Civil Procedure 38(b)(1).

Dated: August 25, 2017

Respectfully submitted,

JOHNSON LAW, PLC

By: _____
VEN R. JOHNSON (P39219)
BRIAN A. MOLDE (P63790)
Attorneys for Plaintiff
99 Monroe Avenue, N.W., Suite 975
Grand Rapids, MI 49503
(616) 235-9400